IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Eric Babos,                                             Case No. 3:09 CV 908

                     Petitioner,           ORDER ADOPTING
          -vs-                             <u>REPORT AND RECOMMENDATION</u>

Robert Welsh, Warden,                  JUDGE JACK ZOUHARY

                   Respondent.

## INTRODUCTION

Petitioner Eric Babos, a state prisoner, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). After this case was reactivated in January 2016, Babos filed an Amended Petition (Doc. 33). The case was referred to Magistrate Judge James Knepp for a Report and Recommendation (R&R). Respondent Robert Welsh moved to dismiss the Amended Petition as untimely (Doc. 36). After additional briefing (Docs. 38, 42, 45, 47), the Magistrate Judge recommended this Court grant the Motion to Dismiss. Babos timely objected (Doc. 51). Accordingly, this Court has reviewed *de novo* those portions of the R&R challenged in the Objection. 28 U.S.C. § 636(b)(1)(B) & (C); *Hill v. Duriron Co.*, 656 F.2d 1208, 1213 (6th Cir. 1981).

## BACKGROUND

As Babos does not meaningfully object to the procedural history and facts set forth in the R&R (Doc. 48 at 1–14), this Court incorporates them by reference and briefly summarizes the timeline of Babos' state court appeals and federal habeas proceedings.

On August 5, 2005, an Ohio jury found Babos guilty of murdering John Riebe. Babos moved for a new trial, but the motion was denied. He was then sentenced to eighteen years to life in prison. He appealed. While his direct appeal was pending, Babos filed a second motion for a new trial. After a hearing, that motion too was denied. He appealed the trial court's denial, and the appeal was consolidated with his direct appeal (*id*. at 3–5). In the consolidated appeal, Babos asserted a single assignment of error: the trial court erred in denying his motion for a new trial. The appellate court affirmed the trial court decision in May 2007, and the Ohio Supreme Court denied leave to appeal in December 2007 (*id.* at 5–6).

While his consolidated appeals were pending with the Ohio Supreme Court, Babos filed an application to reopen his direct appeal, arguing his appellate counsel was ineffective. In August 2007, the application was denied. Babos did not appeal to the Ohio Supreme Court (*id.* at 9–10).

Babos also filed a *pro se* motion for relief from judgment while his consolidated appeals were pending. He raised several arguments, including that his constitutional rights were violated when he was convicted against the weight of the evidence and that the State failed to disclose evidence. The trial court denied the motion in June 2007. The appellate court affirmed. The Ohio Supreme Court denied leave to appeal in June 2008 (*id.* at 6–9).

In April 2009, Babos timely filed a Petition for Writ of Habeas Corpus with this Court (Doc. 1). In February 2010, Babos filed a Motion to Hold Proceedings in Abeyance while he returned to state court to exhaust his claims (Doc. 27). The Motion cited to *Rhines v. Weber*, 544 U.S. 269 (2005), and provided that Babos would "notify this court within thirty days of the exhaustion of his state claims" (Doc. 27 at 6–7). The Motion was marginally granted in March 2010 (Doc. 28). In December 2011, this Court entered an Order staying the case "pending the resolution of a related

case pending in the state court of appeals" (Doc. 31). The Order instructed counsel to "advise the Court, by filing a Notice, when there has been a ruling by the state appellate court, at which time the Court will hold a status conference. In addition, counsel may reactivate this case at any time by filing a Request to Reactivate" (*id.*).

After the case was stayed, Babos returned to state court and moved for leave to file a motion for a new trial and for post-conviction relief. He argued the State failed to disclose evidence; the jury heard faulty scientific testimony regarding gunshot residue; and new voice analysis expert evidence indicates there is a voice in the background of a voicemail Riebe left his estranged wife on the day of the murder, and it is not Babos. Both motions were denied. The appellate court affirmed. In September 2013, the Ohio Supreme Court declined jurisdiction (Doc. 48 at 11–13). Babos did not file a Notice with this Court as instructed, but instead waited for more than two years before filing a Request to Reactivate his case and for leave to file an Amended Petition (Doc 32).

## DISCUSSION

The Amended Petition asserts two grounds for relief: *Brady* violations and ineffective assistance of trial counsel (Doc. 33). The R&R recommends this Court grant the Motion to Dismiss the Amended Petition as time-barred, finding Babos failed to establish an actual innocence claim excusing his noncompliance with AEDPA. In his Objections, Babos makes several conclusory criticisms of the R&R as a whole. However, he does not offer any specific factual or legal basis for many of these statements. "A general objection to the entirety of the magistrate's report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the magistrate useless." *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). "[V]ague, general, or conclusory

objections" do not trigger this Court's *de novo* review. *See Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001). Thus, this Court will address only Babos' specific objections.

**Ground One: Time Bar**

Babos concedes that his claims ultimately "rest upon an actual innocent finding" because he has procedurally defaulted several aspects of his claim (Doc. 51 at 8; *see also* Doc. 38 at 1–2, 17). Still, he objects to the finding that his claims are also time barred and that his delay in returning to federal court was unreasonable. Babos now argues that his Petition "was timely filed and never withdrawn" (Doc. 51 at 8). Without citing any legal authority, he asserts that even if his delay in moving to reactivate the case was unreasonable in a "non-actual innocence matter," "actual innocence cases are different" and *Jurado v. Burt*, 337 F.3d 638 (6th Cir. 2003), does not apply (*id.* at 7–8). He also disagrees that his failure to argue the reasonableness of the delay was a "tacit admission" (*id.* at 8).

This Court agrees with the R&R that the decision to proceed "without arguing whether the reactivation was requested in a timely-manner" (Doc. 38 at 1) was a tacit admission that the Amended Petition was "untimely unless tolling due to actual innocence applies" (Doc. 48 at 17). Babos waived the argument that his delay was reasonable by failing to present it to the Magistrate Judge, and instead choosing to proceed on actual innocence grounds alone. Absent compelling reasons, a party may not raise, at the district court stage, issues that were not presented to the Magistrate Judge. *Glidden Co. v. Kinsella*, 386 F. App'x 535, 544 (6th Cir. 2010); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534–35 (6th Cir. 2001); *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000). The timeliness objections are overruled.

*  *  *

The remainder of Babos' objections relate to his actual innocence claim. If proven, an actual innocence claim "serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *McQuiggen v. Perkins*, 569 U.S. 383, 386 (2013). The gateway is narrow and only available in "rare" cases. *Id.* To succeed on an actual innocence claim, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him" in light of "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). A court must consider all the evidence, both old and new, and "without regard to whether it would necessarily be admitted . . . at trial." *House v. Bell*, 547 U.S. 518, 537–38 (2006) (internal quotation and citation omitted). But a court must also give "due regard" to the "unreliability" of any of the evidence. *Schlup*, 513 U.S. at 328. "'Actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Babos recognizes that the R&R identifies the correct legal standard, but disputes aspects of the analysis and findings (Doc. 51 at 8–12).

**Ground Two: Scope of New Evidence**

Babos objects to the "conclusion that the new evidence establishes only that someone else was present when the key phone calls were placed" (Doc. 51 at 10). He argues that the R&R fails to consider the new evidence "in the context that Babos was at his brothers [sic] house" at the time of Riebe's murder (*id.*). Further, he contends that the R&R improperly "filled in the blanks" of the State's case by agreeing, in a footnote, that nothing in the new evidence establishes that the voice, in the background of the voicemail, was the voice of a live person rather than a radio or television

5

(*id.*). "[W]hat are the odds," Babos argues, "that a radio would be playing with an African-American voice stating he was 'Eric'" (*id.*).

Babos muddles the evidence introduced at trial as well as the scope of the proffered voice analysis evidence. At trial, evidence of six key phone calls was introduced linking Babos to the scene of the murder. The first two calls were from Riebe to Lisa Richman, his estranged wife, at approximately 2:58 and 2:59 PM. *State v. Babos*, 2007 WL 1452844, at *1 (Ohio App. Ct. 2007). *See also* Doc. 13-1 at 319–21, 330. These calls resulted in two brief voicemails. In the first message, Riebe asked Richman to pick up his check from A-1 Heating. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 320. In the second message, Riebe asked her to hurry and stated he had "someone" there waiting for his money. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 320.

The next two calls were from Riebe's home phone to A-1 Heating's service line around 3 PM. Daniel Boyle, A-1 Heating's manager, answered the calls. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 248–53. Boyle testified that during the first call, he spoke with Riebe, and Riebe asked him about money A-1 Heating owed him for a finished project. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 248–50. During the second call, the caller identified himself as "Eric, [Riebe]'s helper" and stated that he wanted his "fucking money." *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 250–53. Boyle explained to him that only Riebe could pick up his check.

A few minutes later, another call was made from Riebe's home phone to A-1 Heating's service line. Robert Pfeifer, A-1 Heating's owner, answered the call. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 272. Pfeifer testified that the caller identified himself as "Eric" and demanded

6

money he claimed A-1 Heating owed him. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 274.

The sixth call was made at approximately 4 PM. This call was from Babos' cellphone to A-1 Heating's main line. *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 275. Pfeifer answered the call, and the caller again identified himself as "Eric." *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 275. There is no dispute that this call was placed by Babos. Babos asked if he could pick up Riebe's check, claiming Riebe could not pick up the check because he was "in the hospital." *Babos*, 2007 WL 1452844, at *1. *See also* Doc. 13-1 at 276. Pfeifer testified that he did not believe Babos was telling the truth, *Babos*, 2007 WL 1452844, at *1, and that there was "[n]o doubt in [his] mind" that the voice was the same as the earlier call he answered. Doc. 13-1 at 283.

In support of his actual innocence claim, Babos submits affidavits from two voice analysis experts, Stephen Scharren (Doc. 36-1 at 62–64) and Robert Leobard (Doc. 36-1 at 65–70). The experts reviewed an enhanced version of one of the voicemails Riebe left Richman. In the enhanced version of the voicemail, a voice can be identified in the background. After comparing the enhanced voicemail with an audio recording of Babos, both experts conclude that the background voice is not Babos, but an African-American man.

The voice analysis experts examined only the enhanced voicemail, and their opinions relate only to the voice in the background of that voicemail. The experts did not, and could not, provide an opinion as to the identity of the caller(s) to A-1 Heating. Babos suggests that like the later calls to A-1 Heating, the background voice also stated that he was Eric (Doc. 51 at 10). Not so. The only decipherable words in the background of the voicemail are "if he don't come do that" (Doc 36-1 at 68).

The only person who could testify about the content of the calls to A-1 Heating is the person who answered each call -- either Boyle or Pfeifer. Although not mentioned in the Objections, Patrick Wainscott, a defense investigator, did aver that Boyle told him the caller he spoke with "sounded like a black man" (Doc. 38-1 at 1). But Boyle is not a voice analysis expert. Wainscott's affidavit was also executed over ten years after Riebe's murder and does not say whether Boyle was certain, or even confident, about the race of the caller. And Babos has not submitted a sworn statement from Boyle. Further, as Wainscott's affidavit acknowledges, Boyle and Pfeifer were never on the same call, and Boyle did not "hear the caller who identified himself as Eric to Mr. Pfeifer" (*id.*). Thus, the new evidence does not undermine Pfeifer's testimony that the calls he answered were from the same caller, or otherwise call into question Pfeiffer's credibility. It is Pfeifer's testimony that links the earlier calls from Riebe's home with the later call from Babos' cell (*see* Doc. 48 at 24 n.7).

In sum, as the R&R recognizes, the new evidence "lend[s] a modicum of support to the defense theory at trial that someone else, specifically an African-American drug dealer, was the real perpetrator in this case" (*id.* at 24). But this Court agrees that "[e]ven assuming the [voice analysis] evidence is completely reliable, it does not undermine the other phone call evidence and testimony submitted at trial" (*id.* at 22). The new evidence does not show that Babos did not make the later calls from Riebe's home to A-1 Heating, or that he was not also present at the time of the voicemail.

Babos contends this conclusion fails to consider the new evidence in the context that Babos was at his brother's house (Doc. 51 at 10). But Babos has not submitted any new evidence bolstering his alibi that he was at his brother's house at the time of the calls and Riebe's murder. At trial, Babos relied primarily on testimony from his brother and his father to establish his alibi.

8

His brother admitted that he did not know whether Babos left the house and then came back sometime before he picked him up (*e.g.*, Doc. 13-2 at 381, 383–84, 394–95). His brother was not there. Likewise, Babos' father testified that once he dropped Babos off at his brother's house, Babos could have left, and he would not have known where he went, for how long, or how he got there (*id.* at 452–55). His father was not there. This Court sees no reason why it must accept Babos' alibi as true -- the jury clearly did not find it to be credible. The second objection is overruled.

**Ground 3: Expert Voice Analysis and Gunshot Residue Testimony**

Babos also objects to the "conclusions that the gunshot residue and voice analysis are not exculpatory" (Doc. 51 at 11). He argues that this "scientific evidence" "debunks" the State's theory that Babos made the calls to A-1 Heating and that Babos had gunshot residue on his sleeve (*id.*).

As discussed above, the voice analysis evidence relates only to the voice in the background of the voicemail, and therefore does not "debunk" the State's theory that Babos made the later phone calls to A-1 Heating.

Turning to the gunshot residue evidence, Babos continues to conflate the testimony of the two State experts and thereby overstates the scope, and weight, of John Nixon's affidavit (*see* Doc. 48 at 25–28). As explained in the R&R, the two State experts did not examine the same sample from Babos. Daniel Davison of the Ohio Bureau of Criminal Identification and Investigation tested samples from Babos' sleeves, and Elana Foster of RJ Lee Group tested a sample from his hand (*id.* at 27; *see also* Doc. 13-1 at 567, 575–77; Doc. 13-2 at 108–09). Davison testified that the left sleeve sample tested positive. *Babos*, 2007 WL 1452844, at *2. *See also* Doc. 13-1 at 578, 581–82. Foster testified that the hand sample tested inconclusive (Doc. 13-2 at 110).

Contrary to Babos' suggestion, Nixon's affidavit (Doc. 36-1 at 41–51) does not establish that "[t]here was no gunshot residue on the sleeves of Babos' flannel shirt," or that "there was no GSR found on anything related to Babos" (Doc. 51 at 4–5). As for Davison's testimony, the only statement from Davison that Nixon criticizes is his statement that SEM analysis is qualitative, not quantitative (Doc. 36-1 at 47–48; *see also* Doc. 13-1 at 578). He does not, and arguably could not, contest Davison's ultimate finding that the sample from Babos' left sleeve contained gunshot residue. Nixon did not have access to the sleeve sample or testing data. And although Nixon criticizes some of RJ Lee Group's testing procedures, such as the fact that the company categorizes results as either positive or inconclusive rather than positive or negative, the experts ultimately reach the same conclusion -- there was no gunshot residue in the hand sample (Doc. 36-1 at 46–51). Although an "inconclusive" result might be misleading without further explanation, Foster testified several times that the inconclusive result meant that no gunshot residue was found (Doc. 13-2 at 110–11, 115–16, 119).

Further, this Court agrees with the R&R, and the Ohio appellate court, that much of the other information in Nixon's affidavit is cumulative of information already introduced at trial, adding little to Babos' case (Doc. 48 at 26–27). The jury was not in the dark about how easily gunshot residue can be transferred. Both State experts attested to this fact on direct and cross-examination (Doc. 13-1 at 568, 575, 585–89; Doc. 13-2 at 106–08, 113, 119), and both parties attempted to use this to bolster their cases. And as the affidavit recognizes, the State experts also testified that the components of gunshot residue can be found in several everyday products (Doc. 13-1 at 572–74; Doc. 13-2 at 104–05, 111). In sum, Nixon's affidavit does not exculpate Babos.

**Ground Four: Viewing Evidence in Isolation**

Finally, Babos argues the Magistrate Judge erred by "taking each piece of new evidence in isolation, without viewing [it] in context of the established or unchallenged evidence in the record" (Doc. 51 at 10). Although the R&R contains a two-page section titled "Cumulative Effect of New Evidence," Babos contends that "the evidence is not so analyzed" (*id*. at 11).

After carefully reviewing the R&R, the parties' briefs, and the state court record, this Court finds the R&R is well-reasoned and thorough, and appropriately applies the *Schlup* standard. Although *Schlup* requires new evidence to be considered in light of old evidence, it is also necessary to analyze each piece of new evidence independently to determine whether it is truly new and reliable. *See House*, 547 U.S. at 537–38. The Sixth Circuit has applied a similar approach in several cases. *See, e.g.*, *Freeman v. Trombley*, 483 F. App'x 51, 57–65 (6th Cir. 2012); *Turner v. Romanowski*, 409 F. App'x 922, 926–30 (6th Cir. 2011). This approach was especially appropriate here due to Babos' inaccurate description of the evidence, both old and new.

The R&R correctly determines that the new evidence, viewed cumulatively and with other evidence in the record, "offers nothing definitively exculpatory, but rather more circumstantial evidence in support of [Babos'] trial theory that someone else committed the crime" (Doc. 48 at 33). Although Babos only raises specific objections to the discussion of the voice analysis and gunshot residue evidence, this Court has also reviewed the analysis of the other new evidence (*id*. at 29–33), and finds it to be well-reasoned. The new evidence simply "does not bear the weight Petitioner places on it" (*id.* at 33) -- some is cumulative, some is unreliable, and even with this evidence, holes remain in Babos' story. Further, this Court agrees that the new evidence does nothing to bolster Babos' alibi that he was at his brother's house at the time of Riebe's murder.

Although the new evidence may make Babos' story more likely, "it is not enough that a petitioner shows that a reasonable doubt exists as to his guilt in light of new evidence." *Aldridge v. Phillips*, 714 F. App'x 562, 563 (6th Cir. 2017). This Court agrees with the R&R that the evidence in this case does not fit within the "extremely narrow" actual-innocence gateway. *See Gibbs v. United States*, 655 F.3d 473, 477 (6th Cir. 2011). Finally, this Court agrees that Babos has not demonstrated an evidentiary hearing is necessary or "might realistically enhance his insufficient showing of actual innocence" (Doc. 48 at 35).

## CONCLUSION

For the foregoing reasons, this Court overrules Babos' Objection (Doc. 51) and adopts the R&R (Doc. 48). The Petition is dismissed. Further, this Court certifies an appeal from this decision could not be taken in good faith and there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c).

IT IS SO ORDERED

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

May 7, 2018